UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

KEVIN WOODS,

Plaintiff,

-against-

ANDREW M. SAUL,
Commissioner of Social Security,

Defendant.

------------------------------------------------------------------X

| USDC SDNY |
|---|
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: March 5, 2021 |

1:19-CV-03368 (SN)

**OPINION & ORDER**

SARAH NETBURN, United States Magistrate Judge:

Plaintiff Kevin Woods seeks review of the decision of the Commissioner of Social

Security (the "Commissioner") finding that he was not disabled or entitled to disability insurance

benefits under the Social Security Act (the "Act"). The parties have cross-moved for judgment

on the pleadings. For the reasons stated below, Woods's motion is GRANTED and the

Commissioner's motion is DENIED. The matter is REMANDED for further proceedings

consistent with this opinion.

**BACKGROUND**

I.      **Administrative History**

Woods applied for disability insurance benefits on January 22, 2016. See Administrative

Record ("R.") as 48, 144–45. He alleged that he was disabled beginning August 5, 2015, due to a

workplace accident that injured his left shoulder, cervical spine, and back. R. 164, 167. His

application was denied, and he requested a hearing before an administrative law judge ("ALJ")

to review his case. R. 775–802. Woods appeared for a hearing before ALJ Sharda Singh on

February 26, 2018, and she issued an unfavorable decision on June 6, 2018. R. 11–28, 775–802.

On March 8, 2019, the Appeals Council denied Woods's request for review, making the ALJ's

decision final. R. 1–6.

## II.   Woods's Civil Case

Woods filed his complaint on April 16, 2019, seeking review of the ALJ's decision. <u>See</u>

ECF No. 1. He requested that the Court set aside the decision and grant him disability benefits

or, alternatively, remand the case for further proceedings, along with attorney's fees and costs.

<u>Id.</u> at ¶¶ 6–9. The Commissioner answered by filing the administrative record, and the parties

cross-moved for judgment on the pleadings. <u>See</u> ECF Nos. 12, 13, 18. Woods argues that the

ALJ failed to evaluate properly his impairments under the correct legal standards, that the ALJ's

decision was not supported by substantial evidence, and that the vocational expert's testimony

was inconsistent with the ALJ's findings. <u>See</u> ECF No. 14. The Commissioner contends that the

ALJ's decision was supported by substantial evidence and that Woods did not demonstrate that

he is disabled. <u>See</u> ECF No. 19.

The Honorable John G. Koeltl referred this case to my docket and the parties consented

to my jurisdiction on October 26, 2020, pursuant to 28 U.S.C. § 636(c). ECF Nos. 22, 25, 26.

## III.   Factual Background

### A.  Non-Medical Evidence

Woods was born in 1965 and was between 46–49 years old during the period at issue.

R. 164. He completed the equivalent of tenth grade in Ireland, leaving school at 16 years old.

R. 168, 791. Woods worked as a carpenter from 2004 through 2009, and as a sandhog from

January 2009 through August 2015, which required lifting approximately 100 pounds and remaining on his feet throughout the day.[1] R. 168, 791.

Woods applied for social security benefits after a workplace accident, where he was hit by a swinging hose across the abdomen that knocked him backward into a well, causing him to lose consciousness and injuring his head, spine, and left shoulder. R. 304. He was taken by ambulance to the emergency room, where he remained overnight. Id.

Woods completed a function report on March 22, 2016. R. 177–84. In that report he wrote that he lived in a home with his wife and kids; that he could dress, bathe, and shave, though these activities elicited pain in his left shoulder; and that he could walk and drive, though only for short distances, due to pain. R. 145, 178, 180. He wrote that he cared for his wife, children, and dogs, but did not list how he did so; he could shop for groceries and clothing in stores, for approximately an hour each day; he was no longer able to participate in any hobbies due to pain, but socialized by having conversations with other adults and his children; and he would leave home to attend doctor appointments, church, and his children's school one to five times per week. R. 180–81.

At his hearing before the ALJ, Woods stated that he experienced stiffness, soreness, and pain in his neck, back, and left shoulder daily. R. 782. He noted his doctors prescribed pain medication, although he stopped taking it due to adverse symptoms and was therefore limited to taking over-the-counter medication. R. 783. He reported that radiofrequency ablation did not help his pain. R. 781–82. Additionally, he could sleep only about two hours each night because of pain, and had difficulty bathing and dressing, especially when reaching overhead. R. 785.

---

[1] A sandhog is a type of tunnel worker who works in the excavation and construction of urban underground tunnels used for underground rail systems and other utilities. R. 791.

Woods estimated that he could sit for half an hour to an hour, walk three blocks, and stand for an hour at a time, though pain required that he frequently shift positions. R. 782–83, 787. He could lift and carry about five pounds, but by February 2018 he could no longer shop for groceries. R. 783–84. He did not need an assistive device to walk, although he previously wore a back brace. R. 786. He drove for approximately half an hour each day to take his children to school or run a brief errand, but he had difficulty sitting for longer than half an hour. R. 787.

Woods acknowledged sometimes engaging in social activities such as attending his children's games. R. 788. He also went on a trip to Mexico the previous year, stating that he did not experience any difficulties during the trip, but was irritated by the need to get up every half hour. Id. He also reported gaining about 14 pounds in weight since his accident, which he attributed to being far more sedentary. R. 788–89.

Louis Szollosy, a vocational expert, also testified at Woods's hearing. R. 794–800. He classified Woods's past work as "construction worker II," which generally required very heavy exertion, and heavy exertion as performed. R. 796. Szollosy was asked to consider a hypothetical person of Woods's age, education, and work experience who could perform sedentary work without climbing ladders, ropes, or scaffolds; with occasional balancing, stooping, kneeling, crouching, crawling, and climbing of stairs and ramps; with no more than frequent overhead reaching; and avoidance of hazards such as moving machinery. R. 797. He testified that such an individual could perform the work of a final assembler, routing clerk, and stuffer, of which there were 250,000; 500,000; and 380,000 jobs in the national economy, respectively. R. 797–98.

### B.  Medical and Opinion Evidence

Woods supplied evidence of both the injuries he sustained in his 2015 workplace accident, as well as that of a 2014 injury to his left foot, detailed below.

4

### 1.  Dr. Erica Papathomas

On January 9, 2014, Dr. Papathomas examined Woods for a work-related left foot injury. R. 374. The exam revealed edema of the dorsal aspect of the left foot along the third metatarsal shaft and third interspace; paresthesia elicited to the third and fourth digits with palpation of the third interspace of the left foot; pain with flexion and extension of the third and fourth digits; pain on palpation along the third metatarsal shaft; slight elevation and shortening in the third digit as compared to the other digits of the foot; and a palpable bony defect along the third metatarsal shaft. Id. Woods's muscle strength was 4 of 5 for all groups tested; with atrophy on the left lower extremity when compared to the right; and he had pain on forefoot compression along the third interspace of the left foot. Id. She made the same findings upon several other visits throughout 2014. See R. R. 372, 373, 367–68, 369, 370, 371.

On October 16, 2014, Dr. Papathomas performed an operation on Woods's left foot to excise the third metatarsal head with third interspace neuroma decompression. R. 250. During the procedure she found that a portion of the metatarsal bone was soft and demineralized, with another portion buried under the interosseous muscle. Id.

Dr. Papathomas saw Woods again on six occasions throughout 2015. See 378–79, 381, 383–86, 388–89. Across these examinations, Woods reported that he felt better, although his foot continued to have pain and swelling. Id. The exams all revealed edema on the dorsal aspect of the left foot; no evidence of dehiscence; pain on palpation along the left third interspace along the healed surgical site; discomfort with range of motion to the third digit; third digit shortening as compared to other digits, with contracture at the third MPJ and lifting of third digit; no bony prominence; paresthesia to all digits especially in third and fourth toes; muscle strength at 4 of 5 for all groups tested; and muscle atrophy to left lower extremity as compared to the right. Id.

Dr. Papathomas noted that Woods walked with an antalgic gait. Id. She requested authorization for Woods to enter physical therapy and for new custom orthotics. Id. She also recommended rest, elevation, warm and cold compresses, anti-inflammatories, icing, massage, range of motion exercises, injections, and supportive shoe gear to treat his ongoing pain. Id.

### 2.  Dr. Lawrence Schulman

On February 9, 2015, Dr. Schulman examined Woods to evaluate whether he was disabled for his New York worker's compensation claim. R. 405–08. Dr. Schulman found that Woods used orthotics in his shoes, but otherwise walked without assistance. R. 406. He diagnosed Woods with a fracture of the left metatarsal and neuroma of the left foot, noting Dr. Papathomas's surgical intervention. R. 407. He opined that Woods had a moderate disability related to the injury in his left foot and could continue to work as long as he avoided jumping, ladder climbing, running, or prolonged standing. Id.

### 3.  Dr. Charles DeMarco

On April 21, 2015, Dr. DeMarco examined Woods's left foot. R. 366. The exam revealed edema on the dorsal aspect of the left foot; no evidence of wound dehiscence; pain on palpation along the surgical site; pain and discomfort on range of motion of the third digit; muscle strength at 4 of 5; and muscle atrophy in the left lower extremity as compared to the right. Id.

On August 11, 2015, Dr. DeMarco examined Woods's left shoulder again, revealing forward flexion to about 90 degrees, abduction to 80 degrees, and internal rotation to the low lumbar area. R. 361. He noted decreased external rotation in the left shoulder as compared to the right, with tenderness over the left acromion and AC joint. Id. He recommended a CT and MRI and continued use of a sling. Id.

He saw Woods again on September 10, 2015. R. 358. He noted left shoulder flexion at 120 degrees; internal rotation to low lumbar area discomfort to palpation along the greater tuberosity with arm extension; weakness against resistance; external rotation at approximately 45 degree; positive Hawkins and Neer signs; positive apprehension and relocation tests; and decreased grip strength. Id.

On October 15, 2015, Dr. DeMarco found Woods's left shoulder flexion at 125 degrees; abduction to 110 degrees; external rotation to 40 degrees; internal rotation to low lumbar area; tenderness over the greater tuberosity; fracture of greater tuberosity; positive impingement sign; positive Hawkins and Neer signs; and positive apprehension and relocation tests. R. 355. A January 14, 2016 exam showed that Woods had left shoulder forward flexion to 130 degrees; abduction to 120 degrees; painful arc of motion from 90 to 130 degrees; tenderness with palpation over the greater tuberosity and arm on extensions; weakness with abduction of the arm against resistance; external rotation at 45 degrees; positive Hawkins and Neer signs; position apprehension and relocation tests; and decreased grip strength. R. 353.

Examining Woods for follow-up after his left shoulder surgery, Dr. DeMarco found his left shoulder forward flexion at 140 degrees; abduction at 110 degrees; and internal rotation to middle lumbar area. R. 568, 656. On January 26, 2017, He diagnosed Woods with superior glenoid labrum lesion of the left shoulder; incomplete rotator cuff tear or rupture of the left shoulder; and impingement syndrome of the left shoulder. R. 638. On March 9, 2017, he noted forward flexion to about 140 degrees; abduction to 110 degrees; and internal rotation to the middle lumbar area. R. 658.

### 4.  Dr. Roger Bartolotta

On August 5, 2015, Woods went to the emergency room after being struck in the chest at work, where Dr. Bartolotta performed CTs of his head, spine, and chest. R. 252–54. The head CT showed chronic non-displaced fracture of the left nasal bone, but no evidence of an acute intracranial injury. R. 252. His spinal CT showed chronic bifid configuration of multiple cervical spinous processes, with an acute mildly displaced fracture of the right aspect of the C6 bifid spinous process. Id. No other acute spinal fractures were identified, but there was mild infiltration of the subcutaneous fat posterior to C6-T1 vertebrae. Id. Woods's chest CT showed a nondisplaced fracture through the left acromion; and a very mild compression deformity of the superior endplate of T7, estimated to be 10–20% vertebral body height loss. R. 253–53. Woods was released the next day and advised to follow up with orthopedics. R. 252–56. He was given a left arm sling and told to wear a neck collar. R. 256.

### 5.  Dr. Andrew Merola

On August 10, 2015, Dr. Merola evaluated Woods for his accident injuries. R. 344–45. He found significant and profound spasm in the cervical and upper portion of the thoracic spine, as well as pain in the C5, C6, and C7 vertebrae. Id. He diagnosed head trauma with loss of consciousness, left upper extremity injury, and shoulder, neck, thoracic, and low back injuries. R. 345. He recommended that Woods undergo diagnostic imaging of the spine and submitted his report to Woods's treating physicians, Dr. Touliopolous and Dr. Hausknecht. R. 343, 345.

On his first visit, and over the next two years, Dr. Merola noted a decrease in pinprick and tactile sensory findings involving Woods's cervical and lumbar vertebrae. See R. 342, 344, 574, 723, 727, 729. In his report to the New York State Worker's Compensation Board, Dr. Merola listed Woods's diagnoses as intervertebral disc displacement of the lumbar region and

8

other cervical disc displacement, unspecified cervical region. R. 642. On June 3, 2017, after

Woods reported increasingly severe pain at the level where "he can no longer tolerate his present

condition and he feels as though it is getting so bad that he cannot live the way he is," Dr. Merloa

recommended a laminectomy and spinal fusion with implants.[2] R. 726. Woods expressed a

desire to proceed with the surgery, and Dr. Merola made multiple surgical requests to the

workmen's compensation carrier to cover the cost.[3] R. 726, 728–30.

### 6. Joel Mittleman, D.C.

Chiropractor Joel Mittleman treated Woods on 20 separate occasions between August 14

and October 19, 2015, for his accident-related injuries. R. 304–340. He diagnosed Woods with

nasal, left acromion, C6, C7, and T7 fractures. R. 304. Woods had not returned to work, his left

arm was in a sling, and he wore a soft cervical collar. Id.

Mittleman observed bilateral tenderness and spasms in the erector spinae muscles, and

paracervical muscles including the trapezius, and levator scapulae, and in the rhomboid muscles

on the left. Id. Woods had positive Soto Hall and Jackson's compression on the left side, with

weakness for shoulder movement on the left. Id. Mittleman diagnosed cervical-brachial

radiculopathy, cervical sprain/strain injury, cervical segmented dysfunction, lumbo-sacral

radiculopathy, lumber sprain/strain injury, lumbar segmental dysfunction, thoracic spine pain,

and thoracic segmental dysfunction. Id. He recommended that Woods undergo chiropractic care

including spinal manipulation and massage three times weekly, and to utilize cryotherapy and

---

[2] A laminectomy is "a type of surgery in which a surgeon removes part or all of the vertebral bone (lamina)." See Laminectomy, Johns Hopkins Medicine: Health, available at https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/laminectomy#:~:text=Laminectomy%20is%20a%20type%20of,spinal%20stenosis%2C%20or%20tumors.

[3] At his hearing, Woods stated that the workman's compensation board opposed the surgery. R. 786.

home exercises to promote healing. Id. He gave Woods a guarded prognosis on the first visit,

labeling him as "totally disabled, unable to return to work." Id.

On nine separate occasions, Mittleman noted positive bilateral straight-leg raise ("SLR")

tests with *extreme* pain between 30–45 degrees, which he noted could indicate low back

radiculopathy or lumbar disc lesion. R. at 307–08, 312–15, 317–18, 324. He also noted positive

SLR tests with *moderate* pain elicited at a range of 30–45 degrees on ten other occasions. R. at

305–06, 309–11, 316, 319, 321–23. On his final visit, Mittleman noted that "[n]o real

improvement" was observed, and he continued to recommend the same course of treatment with

the goals of decreasing pain, decreasing swelling and inflammation, decreasing spasms,

increasing range of motion, increasing the ability to perform normal activities of daily living and

increasing function. R. 321.

### 7.  Dr. Peter Hobeika

On August 31, 2015, Dr. Hobeika performed a CT of Woods's left shoulder, which

showed a mildly displaced fracture involving the distal acromion at the AC joint. R. 267.

### 8.  Dr. Thomas Khoury

On August 10, 2015, Dr. Khoury performed a CT of Woods's lumbar spine, which

revealed apparent post-operative changes from prior right L5-S1 hemilaminectomy/partial

focalectomy. R. 268. He found no acute fracture or subluxation, and minimal disc bulging of L5-

S1 with mild left foraminal stenosis. Id.

### 9.  Dr. Hausknecht

On both August 11, 2015, and September 21, 2015, Dr. Hausknecht diagnosed Woods

with cervical radiculopathy, and he noted on several subsequent dates that the diagnosis applied

specifically in the mid-cervical region. See R. 397, 582, 583, 596, 599, 602, 605, 609, 620, 599.

His examination revealed cervical paravertebral tenderness, pain, and spasm in the left trapezius muscle, with similar findings on subsequent dates. See R. 397, 429, 583.

**10. Dr. Naravan Paruchuri**

On August 31, 2015, Dr. Parachuri performed x-rays of Woods's spine that showed a reduction in disc-space height at L5-S1 vertebra, with intact pedicles, no compression fracture, and a levoscoliosis centered at the L4 level, and probable Schmorl's node formation with inferior endplate of the C6 vertebra. R. 274–76. Parachuri did not identify a definitive cervical fracture, although he advised a more detailed assessment of the bony anatomy. Id. Woods's thoracic spine x-rays showed dextroscoliosis at the T5 level, intact pedicles, and a healed anterior wedge-compression fracture involving the T7 vertebra. R. 276. Dr. Parachuri additionally noted a 20% loss of intervertebral body height. Id.

**11. Dr. Gregory Lawler[4]**

On August 31, 2015, Dr. Gregory Lawler conducted an MRI of Woods's lumbar spine. R. 277–78. He found left foraminal L3-L4 disc herniation; left lateral recess/left foraminal L4-L5 disc herniation; a radial annular tear; a bulging L5-S1 disc; and signs of muscle spasm with straightening of the normal lumbar lordosis. Id.

On September 1, 2015, Dr. Lawler conducted an MRI of Woods's thoracic spine showing a fracture of the T5 and T7 vertebrae, with mild compression deformity of the T7 and mild kyphosis, but no focal disc herniation or significant spinal stenosis. R. 270. He recommended an additional CT to correlate to the MRI findings, and follow-up radiographs to track the healing of the T5 and T7 vertebrae. R. 271. He also conducted an MRI and diffusion tensor imaging of the

---

[4] Plaintiff's brief listed Dr. Lawler's examinations as being performed by Dr. Parachuri and Dr. Aric D. Hausknecht. The record shows, however, that Dr. Lawler conducted and signed these portions of the examinations.

brain, that showed no evidence of generalized brain atrophy/volume loss; normal flow void in the basilar and both supraclinoid internal carotid arteries; mild chronic bilateral frontal, ethmoid, and auxiliary sinus disease; and deformity of the nasal septum. R. 272–73. He concluded that Woods showed no acute intracranial abnormality and had unremarkable DTI maps, however, he recommended additional testing for a possible traumatic brain injury. Id.

### 12. Dr. David Milbauer

On September 3, 2015, Dr. Milbauer conducted an MRI of Woods's left shoulder. R. 282. The MRI showed marrow edema throughout the anterior acromion, compatible with recent osseous injury associated with an os acromiale; small low-grade partial thickening tears of the distal subscapularis and infraspinatus tendon footprint without signs of full thickness rotator cuff tear; mild supraspinatus tendinosis; superior labral tear/SLAP lesion and intraarticular long head biceps tendinosis; and coracoacromial ligament hypertrophy. Id.

### 13. Dr. Uriel Davis

On October 27, 2015, neurologist Dr. Davis evaluated Woods for the purposes of his New York worker's compensation claim. R. 472–78. The exam showed percussive tenderness and muscle spasms in the cervical spine; a positive Spurling's test; percussive tenderness in the thoracic spine; and left shoulder pain at the end point, with guarding, defensive posturing, and positive tenderness. Id. Dr. Davis diagnosed Woods with cervical sprain and strain, radicular pain in the left shoulder, and internal derangement of the left shoulder. R. 477. Dr. Davis opined that Woods presented with a mild, partial work-related disability, and could engage in part-time sedentary work. Id.

### 14. Dr. Arden Kaisman

On November 3, 2015, Woods visited Dr. Kaisman, who administered a thoracic epidural injection. R. 348. He diagnosed Woods with thoracic radiculopathy and T5 and T7 vertebrae compression fractures. R. 347.

### 15. Dr. Steven Touliopoulos

On October 20, 2015, Dr. Touliopoulos examined Woods. R. 354. The exam revealed left shoulder flexion at 135 degrees and abduction at 120 degrees; painful arc of motion at 90 to 130 degrees; internal rotation to low lumbar area; discomfort to palpation along the greater tuberosity with arm extension; weakness with abduction of the arm against resistance; external rotation at approximately 45 degrees; positive Hawkins and Neer signs; positive apprehension and relocation tests; and decreased grip strength. Id. He made substantively similar findings on February 9, 2016. R. 506.

On February 19, 2016, Dr. Touliopoulos operated on Woods's left shoulder, which included diagnostic arthroscopy; repair of the rotator cuff tendon tear; repair of SLAP lesion; stabilization via anterior capsulorrhaphy; subacromial decompression; and debridement of the anterior labral fraying and partial undersurface subscapularis tendon tear. R. 739. The pre- and postoperative diagnosis remained consistent, showing posttraumatic left shoulder partial rotator cuff tendon tears, superior labrum anterior and posterior lesion, occult anterior shoulder instability, subcomial impingement syndrome, and anterior labral fraying. Id.

### 16. Dr. Nina Spooner

On March 21, 2016, Dr. Spooner conducted a consultative exam of Woods's physical conditions. R. 558–62. Woods had recently had shoulder surgery to remove a bone chip and to treat his rotator cuff injury and reported near constant sharp pain in his left shoulder which

radiated to his left elbow, with any movement increasing the pain. R. 558. He also reported

experiencing shooting left shoulder and thoracic pain during the exam, at 5–7 on a 10-point

scale. Id. His pain was worse when he lay down, with the pain waking him from sleep once to

twice weekly, and he felt the pain most in the mornings. R. 558–59. He took Aleve for pain, and

could otherwise alleviate pain for approximately 30 minutes through physical therapy, though he

reported that the two cortisone injections he received did not relieve his pain. R. 559. He rated

his cervical spine pain at 4–7 out of 10, and always present; lumbar spine pain at 3–5, with

lumbar pain improving to a 1 out of 10 within five hours of waking. Id.

Woods reported being able to cook breakfast, but he was unable to lift heavy pots or

groceries, and although his right arm was not injured, carrying items on the right caused neck

pain. Id. He could shower and dress very slowly because of pain and stated that his left arm felt

very weak when dressing. Id. He reported watching TV, listening to the radio, and reading. Id.

Dr. Spooner noted that Woods was in mild to moderate distress with shoulder and back

pain. R. 560. He exhibited slow gait, and toe walking was slow and elicited 8 of 10 pain. Id. Heel

walking was also slow, but without associated pain. Id. Although Woods could squat "most of

the way," it also elicited 8 of 10 thoracic pain. Id. He could almost touch his toes, accompanied

by associated shoulder, thoracic, and shoulder pain. Id. He used no assistive device, and needed

no help changing or getting on and off the exam table. Id.

Dr. Spooner noted that Woods exhibited full cervical spine flexion, with extension

limited to 10 degrees; lateral flexion limited to 10 degree bilaterally; and rotary movement to 30

degrees bilaterally. R. 561. Woods exhibited no scoliosis, kyphosis, or obvious visible thoracic

spine abnormality at the time of the exam. Id. His lumbar spine showed full flexion; limited

extension at 30 degrees; lateral flexion at 10 degree to the right and 20 to the left, with both

14

eliciting pain in the thoracic spine; rotary movement to the full range of motion bilaterally. Id. Woods's supine SLR was to 30 degrees on the right and to 55 degrees on the left, with both eliciting thoracic spine pain. Id. Sitting SLR was negative, to 90 degrees bilaterally. Id.

Woods's shoulder abduction was less than five degrees on the left side and limited to 10 degrees on the right. Id. His left hip abduction was limited to 30 degrees and elicited pain in Woods's back, with adduction limited to 15 degrees. Id. Right hip abduction was limited to 20 degrees, with pain across the back, with adduction limited to 10 degrees. Id. He had full range of motion of the knees and ankles bilaterally, with no evidence of subluxations, contractures, ankylosis, or thickening. Id. His joints were stable and nontender, without redness, heat, swelling, or effusion. Id. Dr. Spooner noted no sensory deficits or observable muscle atrophy. R. 562. Woods's hand and finger dexterity were intact, with grip strength at 5 of 5 in the right hand, and 4 of 5 in the left hand. Id. He could zip, button, and tie. Id.

Dr. Spooner diagnosed Woods with post traumatic spinal injury involving thoracic vertebral fractures and cervical and lumbar pathology; left shoulder injury; and significant residual limitation of range of motion of the left shoulder following surgery, giving him a fair prognosis for recovery. Id. She opined that he was moderately limited in lifting and carrying, walking, climbing stairs, bending, reaching, and squatting, with a mild limitation for standing. Id.

### 17. Dr. Alexandru Burducea

On January 6, 2017, Dr. Burducea diagnosed Woods with disc herniation at the C3-4, C4-5, and C6-7 vertebrae with radiculopathy, and administered a cervical epidural steroid injection. R. 624–25. On February 2, 2017, Dr. Burducea completed cervical facet blocks bilaterally at Woods's C5-6, C6-7, and C7-T1 vertebrae, with cervical facet arthropathy. R. 630.

On February 28, 2017, Dr. Burducea evaluated Woods for pain, noting tenderness to palpation over the bilateral trapezius and para rhomboid musculature, with trigger points noted throughout, accompanied by swelling over the SCM muscles on the right greater than the left. R. 662–63. He noted neck flexion at 30 degrees; extension at 10 degrees; right lateral flexion at 15 degrees; left lateral flexion at 20 degrees; right rotation at 15 degrees; and left rotation at 10 degrees. Subsequent evaluations through revealed the same findings. See R. 665, 687, 718, 736.

On August 4, 2017, Dr. Burducea performed cervical radiofrequency ablation at Woods's right C5-6, right C6-7, and right C7-T1 vertebrae.[5] R. 690. He diagnosed Woods with cervical facet arthropathy, cervical muscle spasms, and failure of conservative treatment. Id. On September 7, 2017, Dr. Burducea performed cervical radiofrequency ablation at Woods's left C5-6, C6-7, and C7-T1 vertebrae. R. 695–96. He noted evidence of motor loss, showing muscle strength of the cervical flexors and extensors as grossly 3 of 5. R. 662. He also found sensory loss of the spine (noted in various reports) that included decreases in pinprick and tactile sensory findings involving the C5, C6, and C7 vertebrae. R. 344–45, 342–43, 574, 575, 579, 665, 687, 718, 723, 725, 727–28, 729–30. He also noted neuro-anatomic distribution of pain through the presence of paraspinal muscle spasm bilaterally in the L3-S1. R. 662–63. He found limited range of motion in the lumber spine, with flexion at 40 degrees; extension at 20 degrees; right lateral flexion at 15 degrees; left lateral flexion at 15 degrees; and right and left trunk rotation at 20 degrees with pain at the end range. R. 662–63.

_____

[5] Radiofrequency ablation uses an electric current to heat up a small area of nerve tissue to stop it from sending pain signals and can provide lasting relief for people with chronic nerve pain. See Cleveland Clinic, Radiofrequency Ablation, available at https://my.clevelandclinic.org/health/treatments/17411-radiofrequency-ablation.

### 18. Dr. Ronald L. Mann

On February 24, 2017, Dr. Mann evaluated Woods for the New York State Worker's Compensation Board. R. 646–51. He diagnosed Woods with left shoulder injury following surgery, cervical spine strain/sprain with spinous process fracture, and thoracic compression fracture, finding that the injuries were causally related to his accident. R. 684. He opined that Woods could occasionally climb, kneel, or bend; frequently stand or walk, and constantly sit. Id.

### 19. Dr. Michael Healy

On February 2, 2018, Dr. Healy conducted a consultative examination of Woods for the Division of Disability Determination. R. 764–74. He noted that Woods complained of back pain primarily, located at the lumbar L4-L5 vertebrae, and resulting from his 2015 workplace injury. R. 764. Woods reported that the pain was made worse by prolonged sitting, standing, or walking. Id. Woods also complained of neck pain, which was aggravated by the cold, and that the pain radiated to both shoulders. Id. Woods reported he could no longer cook, clean, launder, or shop because of back pain. R. 765. He could shower and dress himself, though he sometimes required his wife's help. Id. He could watch TV, listen to the radio, read, and go for short walks. Id.

Dr. Healy noted that Woods appeared to be in slight discomfort. Id. His gait was widened and shortened, and he could walk on heels and toes. Id. His squat was at 20%, with a widened stance. Id. He did not require help changing, getting on or off the exam table, however, he could not rise from the chair without difficulty. Id.

Woods exhibited decreased flexion and extension in the cervical spine, 20 degrees anterior and posterior; lateral flexion at 15 degrees bilateral; and no scoliosis. R. 766. His lumbar spine had decreased flexion and extension at 30 degrees; lateral flexion and rotary motion full bilaterally; and negative single leg raise bilaterally. Id. He exhibited full range of motion of the

hips, knees, and ankles bilaterally, without evident subluxation, contractures, ankylosis, or thickening. Id. His joints were stable and nontender, without redness, heat, swelling, or effusion. Id. Dr. Healy found no sensory deficit but noted decreased strength in all four extremities at four out of five, though without evidence of muscle atrophy. Id. Woods's hand and finger dexterity remained intact, with five out of five grip strength bilaterally. Id.

He diagnosed Woods with chronic back pain, probable lumbar spinal intervertebral disc disruption; chronic neck pain, probable cervical spinal intervertebral disc disruption; and bilateral shoulder pain, probable rotator cuff injury. R. 766–67. He opined that Woods was moderately limited in sitting, standing, walking, climbing, bending, lifting, and carrying.

### C.  Non-Examining Agency Reviewer N. Harris-Wilds

On April 4, 2016, disability examiner Harris-Wilds reviewed Woods's medical records. The examiner noted that Woods exhibited mild to moderate distress with left shoulder and back pain. R. 49–58. He had a slow gait, slow toe-walking eliciting 8 of 10 thoracic pain, and slow heel walking eliciting less pain. Id. Woods could squat most of the way, though this also elicited 8 of 10 pain. Id. He could almost touch his toes, but this elicited left shoulder and thoracic pain. Id . His stance was stiff, but needed no help getting on or off the exam table and could rise from the chair without difficulty. Id.

Harris-Wilds determined Woods to have a both a spine disorder and major joint dysfunction at a severe level. Id. The examiner opined that Woods could both *occasionally* and *frequently* lift or carry 10 pounds; that he could stand or walk for two-hour intervals and sit for 6-hour intervals; and that he was limited in pushing and pulling with his left upper extremities. R. at 54–55. The examiner further opined that Woods could occasionally climb ramps and stairs; climb ladders, ropes, and scaffolds; balance; stoop; kneel; crouch; and crawl. R. 55. He was

limited in reaching on his left side overhead. Id. The examiner determined Woods was not disabled and recommended sedentary work. R. 57.

## IV.    The ALJ's Decision

On June 6, 2018, the ALJ denied Woods's application. R. 11–28. The ALJ identified the administrative and procedural history, the applicable law, and her findings of fact and conclusions of law. Id.

At step one, she determined that Woods met the insured status requirements of the Act through December 31, 2021, and that he had not engaged in any substantial gainful activity since August 5, 2015. R. 16. At step two, she found that Woods's degenerative disc disease and arthritis qualified as severe impairments. Id. At step three, she determined that his impairments did not equal the severity of any one of the listed disabilities ("Listings") in the applicable regulations. R. 16–17; see 20 C.F.R. Pts. 404.1520(d), 4040.1525, and 404.1526.

First, the ALJ described the requirements of Listing 1.02. R. 16–17. She stated that Woods offered no evidence that he was "limited to the above-referenced parameter," and concluded, therefore, that Woods's impairments did not meet Listing 1.02. R. 17. Second, she evaluated Woods's spinal impairments under Listing 1.04. See Id. After describing the requirements under the Listing, she stated simply that "the instant claim does not satisfy these listing parameters," and therefore found that Woods did not meet Listing 1.04. Id.

At step four, the ALJ determined that Woods had the residual functional capacity ("RFC") to perform sedentary work, with some limitations, including never climbing ladders, ropes, or scaffolds, and only occasionally climbing stairs, balancing, stooping, kneeling, crouching, and crawling, as well as reaching with his left arm overhead, and avoiding hazards such as machinery. See R. 18; 20 C.F.R. § 404.1567(a). She found that, given this RFC, he was

unable to perform his past work which "requires exertional effort well in excess of [Woods's] current capabilities." R. 21.

At step five, the ALJ concluded that there were numerous jobs available in the national economy for Woods to perform. R. 21–22. This was based upon an evaluation of his age, education, work experience, RFC, and testimony of the vocational expert. Thus, because the ALJ found that Woods was able to engage in substantially gainful activity, she concluded that he had not been disabled through the applicable period and was not entitled to benefits. R. 22.

## V.       The Appeals Council's Determination

Following the ALJ's unfavorable decision, Woods requested that the Appeals Council review the decision. See R. 10. On March 8, 2019, the Appeals Council denied his request for review, making the ALJ's decision final.

## DISCUSSION

## I.       Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error or it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cr. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Commissioner's findings as to any fact supported by substantial evidence are conclusive. Diaz v.

Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. See Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.") (emphasis in original) (citations and internal quotation marks omitted). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." See Rosa, 168 F.3d at 77.

## II.    Definition of Disability

A claimant is disabled under the Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). A claimant will be found to be disabled only if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." Id. § 423(d)(2)(A),.

An ALJ must proceed through a five-step process to make a disability determination. See 20 C.F.R. § 404.1520. The steps are followed in order; if it is determined that the claimant is or

is not disabled at a step of the evaluation process, the evaluation will not progress to the next

step. See 20 C.F.R. § 404.1520. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d

770, 774 (2d Cir. 1999)).

A claimant bears the burden of proof as to steps one, two, three, and four; the

Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir.

2013) (citation omitted).

## III.   The ALJ's Application of the Five-Step Analysis

Woods argues that the ALJ committed legal error at steps two through four of the

sequential evaluation, and that portions of the ALJ's decision are not supported by substantial

evidence. Although the ALJ found that Woods suffered from degenerative disc disease and

arthritis at step two, Woods contests her failure to consider evidence of his other impairments,

including injuries to his head/brain, chest, left shoulder, and left foot. At step three, Woods

contends that the ALJ erred in finding that no evidence supported a finding of disability under

Listing 1.04A. At step four, Woods argues that the RFC determined by the ALJ is not supported

by substantial evidence, is inconsistent with the vocational expert's testimony, and was arrived at

by failing to consider his subjective complaints of pain, by failing to consider his continued

pursuit of pain relief, and by making improper credibility determinations.

Woods's arguments are taken up in turn. Preliminarily, the Court finds that the ALJ's

analysis at step one was legally and factually supported, and does not merit further review.

### A.  The ALJ's Evaluation of Woods's Impairments at Step Two

At step two, the ALJ determined that Woods's only severe impairments were

degenerative disc disease and arthritis. R. 16. Woods argues that the ALJ erred in failing to

consider whether his head/brain injury, chest injury, left shoulder injury, and left foot injury

qualified as severe impairments individually, or to consider the combined effects of these

impairments on his ability to perform work.

It has been long established that at step two, an ALJ "may do no more than screen out *de

minimis* claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). "[T]he mere presence of a

disease or impairment, or establishing that a person has been diagnosed or treated for a disease or

impairment is not, by itself, sufficient to render a condition 'severe.'" Molina v. Colvin, No. 13-

cv-04989 (AJP), 2014 WL 3445335 at *10 (S.D.N.Y. Jul. 15, 2014) (citations and quotation

omitted). Rather, an impairment is severe if it "significantly limits physical or mental abilities to

do basic work activities." 20 C.F.R. § 404.1520(c). Under the applicable regulations, the ALJ

"must assess the impact of the combination of those impairments on the person's ability to

function, rather than assess separately the contribution of each impairment to the restriction of

his or her activity as if each impairment existed alone." SSR 85-28, 1985 WL 56856, at *3

(S.S.A. 1985).

As detailed above, the record contains significant evidence of Woods's left shoulder and

left foot injuries, as well as some evidence of a head injury. See, e.g., R. 252–54, 270, 282, 374,

394, 739. And despite the Commissioner's selective recounting of the record, there was evidence that at least Woods's left shoulder injury and left-foot injuries did significantly limit his ability to perform some basic work activities, as was acknowledged by the ALJ at step four. See, e.g., R. 20 (allocating "good weight" to Dr. Spooner's findings that Woods was limited in lifting, carrying, walking, climbing stairs, and standing). Nothing at step two indicates that the ALJ considered these impairments in combination with Woods's other impairments.

At a minimum, the ALJ erred in determining that Woods's severe impairments did not include his left shoulder and left foot injuries. That error is harmless, however, because she found that Woods suffered from other severe impairments and proceeded onto the next steps of the sequential evaluation. See Winder v. Berryhill, 369 F. Supp. 3d 450, 456 ("It is settled . . . that failure to find every impairment at issue severe at Step Two is not reversible error if the ALJ incorporates those impairments in the later steps of the sequential analysis." (citing Woodmany v. Colvin, 577 F. App'x 72, 74 n.1 (2d Cir. 2014)); see also Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order) (same).

Here, the ALJ discussed Woods's left shoulder, left foot, and head/brain injuries at the fourth step, including a discussion of Woods's subjective complaints of shoulder pain and stiffness, difficulty putting on a sweater, and surgical procedures. R. 18–19. She also discussed his left foot injury but noted that it had not prevented him from returning to heavy work in the past. R. 19. Finally, she noted that although Woods complained of headaches and memory deficits, an MRI and an EEG both showed normal results. R. 20. Accordingly, any error in failing to name Woods's other injuries as "severe" was harmless.

**B.  The ALJ's Evaluation of Woods's Spine Impairments at Step Three**

Woods argues that the ALJ failed to evaluate properly Listing 1.04A disorders of the spine, and that the evidence he submitted plainly showed that his cervical, thoracic, and lumber spinal impairments met the parameters of Listing 1.04A, meriting a finding that he was disabled as a matter of law. Thus, he contends the ALJ erred in finding that the evidence did not support a finding of disability under the Listing.

The Commissioner argues that Woods failed to meet his burden of showing that his injuries met all of the Listing requirements. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (emphasis added); see 20 C.F.R. § 404.1525(c)(3) ("We will find that your impairment(s) meets the requirements of a listing when it satisfies *all* of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement.").

Disorders of the spine are evaluated under Listing 1.04. These include (but are not limited to) herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fractures. See List. § 1.04. To qualify as disabled under Listing 1.04, subsection A, the claimant must show some diagnosed spinal disorder, with: (i) evidence of nerve root compression characterized by neuro-anatomic distributions of pain; (ii) limitation of motion of the spine; (iii) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back; (iv) positive straight-leg raising test (sitting and supine). See List. § 1.04A.

Generally, courts require ALJs to explain why a claimant did not meet or equal a listing where the medical evidence appears to match the symptoms described in the Listings, however, "a Court may still uphold the ALJ's determination if it is supported by substantial evidence." Rockwood v. Astrue, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009) (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir. 1982)). Although the ALJ referenced Listing 1.04 in her decision, she failed to provide her reasoning for determining that Woods's injuries "[did] not satisfy the listing parameters." R. 17. Moreover, she did not discuss any of the relevant medical evidence related to Listing 1.04A at subsequent steps in her analysis, precluding the Court from inferring her reasoning. Accordingly, the Court examines the evidence in the record against the Listing 1.04A requirements below.

### 1. Evidence of Nerve Root Compression in Woods's Cervical, Thoracic, and Lumbar Spine Injuries

The first requirement under Listing 1.04A is "evidence of nerve root compression characterized by neuro-anatomic distribution of pain." See 20 C.F.R. Part 4040, Sub. P, App'x 1 § 104A. There is overwhelming evidence that Woods complained of neuro-anatomic pain throughout the relevant time period of radiating pain in his neck, shoulders, upper and lower back, legs, and feet, as well as regional thoracic pain, and pain and numbness to the toes. See R. 279, 294–96, 299, 304–19, 322–24, 340, 342, 350, 355–56, 361, 375, 392, 396, 417, 421, 429, 447, 460, 462–463, 474, 506, 510, 516–18, 521, 525, 528, 531, 558–59, 568, 574–75, 583, 606, 624, 630, 633, 644, 656, 660, 662, 665, 668, 687, 693, 718, 722–23, 725, 727, 729, 761, 764; Norman v. Astrue, 912 F. Supp. 2d 33, 78 (S.D.N.Y. 2012) (finding evidence of neuro-anatomic pain where plaintiff complained of radiating pain in neck, shoulder, lower back, and legs); Muntz v. Astrue, 540 F. Supp. 2d 411, 420 (W.D.N.Y. 2008) (finding evidence of neuro-anatomic pain where the plaintiff complained of back pain with radiating numbness and weakness).

Additionally, Woods's subjective complaints of pain were substantiated through multiple examinations as well, which revealed percussion tenderness, muscle spasm, exaggerated kyphosis of the thoracic spine, and positive Spurling's and Jackson's tests. See, e.g., R. 397, 460, 561, 662–63, 665–66, 687–88, 718–19, 766. Possible nerve root compression was also supported by the diagnoses of cervical, thoracic, and lumbar radiculopathy, thoracic neuritis or radiculitis, mild stenosis, thoracic compression fractures, cervical and lumbar sprain/strain injury, cervical arthropathy, cervical and lumbar disc herniation, and cervical muscle spasming. See, e.g., R. 274–80, 301, 304, 347, 397, 460, 582, 583, 596, 599, 602, 605, 609, 620, 624–25, 630, 690, 695. Accordingly, both Woods's subjective complaints of pain combined with objective assessments and examinations which plainly relate to possible nerve compression evidence the first requirement of Listing 1.04A. See, e.g., Norman, 912 F. Supp. 2d at 79 (finding that subjective complaints combined with diagnosed cervical and lumbar radiculopathy, among other diagnoses, met the first requirement); Posey v. Saul, No. 19-cv-04578 (PKC), 2020 WL 4287359, at *3 (E.D.N.Y. Jul. 27, 2020) (finding that diagnoses of neuritis, disc herniation, and stenosis all supported an inference of nerve root compression).

## 2.   Limitation of Motion of the Cervical, Thoracic, and Lumbar Spine

The second requirement under Listing 1.04A is "limitation of motion of the spine." 20 C.F.R. Part 404, Sub. P, App'x 1 § 104A. Objective evidence of the cervical spine's limited range of motion was presented throughout the record, including of limited extension, bilateral flexion, and rotary movement. See, e.g., R. 398, 561, 566, 662–63, 665–66, 687–88, 718–19, 766. Likewise, there is substantial evidence of limited motion in the thoracic spine—noting reduced forward flexion, bilateral flexion, bilateral rotation, as well as bilateral moderate tightness in the thoracic paraspinal area and trapezius. See, e.g., R. 397, 718. Limited range of

27

motion in the lumbar spine—noting reduced flexion, extension, bilateral flexion, and right and left trunk rotation—was evidenced throughout the record as well. See, e.g., R. 297, 561–62, 662–62, 766. Treatment records also note tenderness and muscle spasm in the area of the spine and surrounding area, with pain associated with motion—finding significant and profound spasm in the cervical and upper portion of the thoracic spine. See, e.g., R. 344–45. In addition, the records show that Woods had difficulty toe-walking and squatting, each of which elicited severe pain in the thoracic spine. See, e.g., R. 560.

The Commissioner offers no rebuttal to this evidence, and the Court is satisfied that Woods showed evidence that he suffered from limitation of motion of the spine during the applicable period.

### 3. Motor Loss of the Cervical, Thoracic, and Lumbar Spine

The third requirement under Listing 1.04A is "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss." See 20 C.F.R. Part 404, Sub. P, App'x 1 § 104A.

First, the treatment records plainly indicate that Woods experienced some sensory loss and reflex loss as a result of his cervical spinal injuries, including multiple findings that he had decreased sensations in the left and right C6-7 dermatomes, decreased pinprick and tactile sensory findings at the C5, C6, and C7 vertebrae, blunted or decreased upper-extremity reflexes. See, e.g., R. 662–63, 665, 687, 718. Likewise, sensory loss at the lumbar spine was shown in decreased sensation in the L4-S1 dermatomes, decreased pinprick and tactile sensitivity at the L3, L4, and L5 vertebrae, and dermatomyotomal distribution of the lower extremity, legs, and feet, with S1 dysesthesias. See, e.g., 662–63, 579. Further reflex loss at the thoracic and lumbar spine was shown by knee jerk, ankle jerk, and multiple positive SLR tests in both the supine and

28

seated positions, including ten positive bilateral SLR tests performed by Dr. Mittleman across several months. See, e.g., R. 305–06, 309–11, 316, 319, 321–23, 447–48, 561, 579.

Second, motor loss was evidenced in Dr. Burducea's examinations, who noted decreased muscle strength at the cervical, thoracic, and lumbar flexors and extensors, along with Dr. Mittleman's observation of pain-limited weakness in shoulder movements on the left side related to the cervical examination, and Dr. Healy's observation of notably decreased strength in all four extremities. See, e.g., 304, 662–63, 766.

In contrast, the Commissioner argues that multiple examinations showed intact strength and sensation, grossly normal reflexes in upper and lower extremities, and no muscle atrophy, no sensory deficits, and failed to establish positive supine and straight leg raising tests.[6] See, e.g., R. 254, 397–98, 469, 475, 464, 562, 583, 648, 649, 766. The Commissioner further argues that "[g]iven that plaintiff frequently demonstrated normal motor strength, intact sensation, normal reflexes, and negative straight leg raising tests, he has failed to demonstrate that his condition met the requirements of section 1.04.A." See ECF No. 19 at *33 (citing Conetta v. Berryhill, 365 F. Supp. 3d 383, 396–98 (S.D.N.Y. 2019)).

The Commissioners position is overstated. It is true that some of the relevant evidence is inconsistent, but the Commissioner's contention that there is *no* evidence supporting a finding under Listing 1.04A is imprecise. Furthermore, the Commissioner's reliance on Conetta is misplaced because the ALJ in that case conducted a thorough evaluation of the medical evidence related to the plaintiff's spinal injuries, including evidence in support of the plaintiff's claims and

---

[6] The Court notes that Woods was required only to show positive SLR tests in both the seated and supine positions regarding his lower-back injuries under Listing 1.04A—even if such tests were excluded from the record, Woods presented enough evidence of his cervical spine injury to meet each of the requirements under the Listing.

"ample evidence to the contrary." Conetta, 365 F. Supp. 3d at 397. The ALJ here, however, did not explain her reasoning at all, much less provide a thorough examination of the evidence Woods's spinal injuries.

This case is far more analogous to Norman, where the ALJ did not provide any reasoning when determining that the plaintiff was not disabled under Listing 1.04A. See 912 F. Supp. 2d at 77–81. That court found that there was significant evidence of the plaintiff's spinal injuries in the record—much of it substantively similar to the evidence available here—supporting a finding that the plaintiff was disabled. Id. And, as here, although the Commissioner pointed to conflicting evidence in the record, the court noted that "it is not for [the court] to reconcile the conflicting medical evidence in the record—that is the obligation of the ALJ." Id. at 79.

"In light of evidence that favors a finding that the listing was met, the ALJ must provide an explanation of his reasoning as to why he believes the requirements are not met and explain the credibility determinations and inferences he drew in reaching that conclusion." Perozzi v. Berryhill, 287 F. Supp. 3d 471, 486 (S.D.N.Y. 2018) (quotation omitted). Given the differing evidence, it is possible that the ALJ would have determined that Woods's did not meet or equal Listing 1.04A, however, "this possibility does not relieve the ALJ of [her] obligation to discuss the potential applicability of Listing 1.04A, or at the very least, to provide plaintiff with an explanation of [her] reasoning as to why the plaintiff's impairments did not meet" the Listing. Norman, 912 F. Supp. 2d at 81. This is consistent with the directives of the Court of Appeals, which has noted that where "credibility determinations and inference drawing is required of the ALJ," remand is appropriate to allow the ALJ to explain her reasoning. Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982); see Ryan v. Astrue, 5 F. Supp. 3d 493, 507–08 (S.D.N.Y. 2014) (collecting post-Berry cases to conclude that remand is appropriate "where the evidence on the

issue of whether a claimant meets or equals the listing requirements is equipoise" but the ALJ

fails to explain his reasoning).

Accordingly, upon remand the ALJ should assess whether Woods meets Listing 1.04A,

and if she reaffirms her prior conclusion, she should provide "a clearer explanation" for that

decision. Berry, 675 F.2d at 469.

### C.  The ALJ's Credibility Determinations

Next, Woods argues that the ALJ erred in finding that Woods's statements concerning the

intensity, persistence, and limiting effects of his symptoms arising from his impairments were

not consistent with the medical evidence and other evidence in the record. He contends that the

ALJ failed to consider many of the various factors set forth in the regulations required to assess a

claimant's credibility. See C.F.R. 404.1529. Specifically, he argues that she did not consider

several of his subjective complaints about his symptoms.

The regulations lay out a two-step process for assessing a claimant's subjective

complaints, the first of which is deciding is the claimant suffers from a medically determinable

impairment that could reasonably be expected to produce the alleged symptoms. See 20 C.F.R. §

404.1529(b). At the second step:

> [T]he ALJ must consider the extent to which the claimant's symptoms can
> reasonably be accepted as consistent with the objective medical evidence and other
> evidence of record. The ALJ must consider statement the claimant or others made
> about his impairments, his restrictions, his daily activities, his efforts to work, or
> any other relevant statements he makes to medical sources during the course of
> examination or treatment, or to the agency during interviews, on applications, in
> letters, and in testimony in its administrative proceedings.

Grenier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (quotations, citations, and brackets omitted).

An "ALJ must make credibility findings" where the evidence concerning the claimant's

symptoms conflicts. Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009). In

making such determinations, an ALJ must provide "specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 97–7p, 1996 WL 374186, at *4 (S.S.A. 1996). The court gives "special deference" to the ALJ's credibility determinations, however, "because the ALJ [has] the opportunity to observe [the claimant's] demeanor" during a hearing. Marquez v. Colvin, No 12-cv-06819, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013).

Here, the ALJ described the two-step process and discussed Woods's statements regarding his symptoms, restrictions, daily activities, and other relevant statements in the medical records. The Court notes, however, that the ALJ's examination of the record regarding Woods's abilities discussed only those portions of medical opinions supporting her RFC finding, while omitting the contradictory portions. For example, the ALJ noted Woods's subjective reports of "significant pain relief" and "less difficulty turning his head to the side" following a medial branch block injection from Dr. Burducea. R. 20. That same record, however, notes that his pain was constant, progressed as the day went on, and was moderate to severe. R. 662–63. Additionally, he noted that Woods "does not sleep well because the pain and cannot perform daily activities." Id. Furthermore, he stated that Woods "failed conservative treatment" and was "in severe pain." Id. Indeed, he recommended radiofrequency ablation to treat Woods's pain. Id.

Likewise, the ALJ countered Woods's subjective complaints by citing Dr. DeMarco's January 26, 2017 report that indicated that Woods was able to flex the elbow and wrist, with forward flexion to 140 degrees, abduction to 110 degrees, and internal rotation to the mid-lumbar area. R. 20; 641. Yet she disregarded the doctor's assessment that Woods "cannot return to work . . . due to pain in left shoulder," and his confirmation that Woods's injury was "consistent with [his] objective findings." R. 640, 641. As a final example, the ALJ cited Dr. Hausknecht's September 8, 2015 report, made approximately one month after Woods's accident, which stated

that he "has shown good clinical improvement." R. 19; 622. Again, this citation is taken out of context, where the noted improvements were resolved headaches and improved dizziness. R. 621. Yet the same report noted "pain limited weakness of the left shoulder" and "paravertebral muscular spasm." Id. He also prescribed Woods with a muscle relaxant, pain medication, and a thoracolumbar support. R. 622. Perhaps most tellingly, and contrary to the ALJ's assertion, the same report states that Dr. Hausknecht advised Woods to "restrict his activities" and gave him a guarded prognosis. Id.

The Court of Appeals, and other circuit courts have made clear that administrative "cherry picking" of relevant evidence—meaning giving credit to that evidence which supports a specific administrative finding, while rejecting conflicting evidence from the same source—should be viewed with skepticism. See, e.g., Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983)); see also Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011). Such a selective or incomplete recounting by the ALJ "can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." Younes v. Colvin, No. 14-cv-00170 (DNH) (ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015) (citing Gernier v. Astrue, 606 F.3d 46, 50 (2d Cir. 2010)).[7] The ALJ's selective embrace of the medical evidence (and only those portions of reports that supported her conclusion), necessitated a careful explanation of why she was giving precedence to some portions of same-source records; she failed to provide such an explanation.

---

[7] Woods argues that even though the ALJ described his daily activities, she failed to note his express limitations in those activities. For example, she wrote that he was "able to care for his personal needs without assistance." R. 19. But he explicitly stated that it was difficult for him to shower, that he sometimes sat on the shower floor because of pain, and that sometimes he *did* require his wife's assistance in showering. R. 765. These omissions are parallel to those made by the ALJ in Gernier, which that court described as evincing "so serious a misunderstanding of [the claimant's] statements that it cannot be deemed to have complied with the requirement that they be taken into account." 606 F.3d at 50.

See Callahan v. Berryhill, No. 17-cv-4920 (JS) (AKT), 2020 WL 7000732, at *19 (E.D.N.Y.

Aug. 11, 2020) ("[A]n ALJ who elects to adopt only portions of a medical opinion must explain

his or her decision to reject the remaining portions.").

      Accordingly, I find that the ALJ erred by failing to explain her credibility determinations

when evaluating Woods's subjective complaints against the record. Upon remand, the ALJ will

need to reevaluate the record and provide her reasoning as to her credibility determinations,

particularly when giving weight to one portion of a source-record, but not another.

      Finally, Woods argues that the ALJ failed to consider his persistent attempts to obtain

pain relief for his symptoms, which could indicate that his "symptoms are a source of distress

and may show that they are intense and persistent." SSR 16-3P, 2017 WL 5180304, at *9 (S.S.A.

2017). Because remand is already warranted, the Court takes no position on this argument, other

than to direct the ALJ to consider this evidence in her reevaluation.

### D.  Woods's Remaining Arguments

      Because the ALJ's errors necessitate remand legal error, the Court does not reach

Woods's remaining arguments that the ALJ's RFC determination was not supported by

substantial evidence, and that the vocational expert's testimony is inconsistent with the ALJ's

RFC findings. See Johnson v. Bowen, 817 F.2d 983, 987 (2d Cir. 1987); see also Meadors v.

Astrue, 370 Fed. App'x 179, 185–86 (2d Cir. 2010) (concluding that the ALJ's errors "in

assessing the [claimant's] credibility . . . depriv[ed the court] of the ability to subject his RFC

determination to meaningful review").

## CONCLUSION

Woods's motion is GRANTED and the Commissioner's motion is DENIED. The matter is REMANDED for further proceedings consistent with this opinion.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

Dated:  March 5, 2021
        New York, New York